DAWKINS, J.
Defendants appeal from a conviction of murder and sentence of death. Twenty-eight bills ■ of exceptions were retained during the course of the trig.1, but only a few of them have been urged before this court.
Bills Nos. 1 and 2.
[1] The first bill was to the refusal to allow defendants to file an answer to the written objections of the state to a change of venue sought by the defense; and the *196 second was reserved to the further refusal to allow a supplemental motion for a change of venue.
Nothing having been said, either -in oral argument or in brief about these bills, we take it that both have been abandoned. In any event, no proof was tendered, and the jury was obtained without exhausting the peremptory challenges of the defendants; hence the ruling must stand.
Bill No. 3.
[2] The third bill covers the overruling of a motion for a continuance. The judge’s per curiam- thereon is as follows:
“The motion for the continuance does not state the facts fully. On the day of the arraignment, the accused being without counsel, the court appointed Gordon W. Goodbee to defend them, and at that time the court informed the defendants themselves that if they desired to employ additional counsel they would have ample time to do so. No request was made for more time or any intimation given the court that more time was desired until the ease was called for trial, although counsel had full knowledge that a jury was being drawn to try this case and that all preparations were being made for the trial; witnesses for state and defense being summoned, etc.
“Mr. Goodbee was appointed by the court and is an experienced lawyer, and in length of practice is the oldest at the bar. He served four years as district attorney of this district, has been an active practitioner in both civil and criminal matters for more than twenty years, and therefore was well qualified to represent the interest of the accused. The accused Rest-er employed Mr. Goodbee after his appointment and paid him a handsome fee. Erom March 9th, on the day of his appointment, to March 19th, on the day the case was assigned for trial, no court was held at Eranklinton, and Mr. Goodbee devoted his entire time in preparation of this ease for trial.. At once after his appointment he was afforded every opportunity for conference with the accused, the members of their families, and their friends and was in constant conference during said time.
“Mr. Eelder, the assistant counsel, visited Eranklinton within two or three days after the case was assigned in conference with Mr. Goodbee and relatives of the accused Rester, and while the court does not say that he was employed earlier than was stated in the motion, the court does say that it construes his statement to simply mean the final payment of the fees which had been agreed upon before was not made until the time stated, that the employment or agreement was made several days prior. Mi*. Eelder lives within forty-five minutes drive of the courthouse, has been active in criminal cases before this court for several years, and is a lawyer with a wide reputation.
“The motion for a continuance was purely for delay, and the defendants were not prejudiced in any way, and no legal rights in their favor were violated by the denial of the motion. The trial of the case convinced the court that the ruling of the court was correct. There was no demand for witnesses, no request for delay for conference, and no legal rights denied the defendants which any continuance could have secured for them.”
We find no basis for disturbing the ruling thus made. State v. Leary, 111 La. 301, 35 South. 559; State v. Wilson, 33 La. Ann. 261.
Bill No. 4.
[3] Defendant Gideon Rester.filed a motion for a severance. The allegations were that defendant had been informed and believed that Ms codefendant, John Murphy, would make a “judicial confession” of said murders, that the trial of Murphy would be “merely formal,” and that “it would be an injustice to 'mover to be tried jointly with the said John Murphy. Mover is informed that it is the purpose of the state to use confessions or purported confessions of the said John Murphy and the same are not admissible against this defendant, and to be tried jointly with the said John Murphy would work an injury to this defendant in making his defense.”
Neither has anything been said about this bill, and it must therefore have been abandoned. But we see nothing in it to have justified a severance; no sufficient grounds are alleged as to how the defenses would conflict, and the mover could be and was amply protected against any ill effects of the confession by his codefendant by instructions from the court. The bill is without merit.
*197 Bills 5 to 17.
[4] Bills 5 to 17, inclusive, were to rulings upon challenges to jurors; but, since the peremptory challenges were not exhausted, and the bills have not been, mentioned by counsel, the rulings on which they rest must be affirmed.
Bill No. 18.
[5] Bill No. 18 was reserved to the overruling of the motion for a change of venue, after the jury had been empaneled. In his per curiam the judge states that some seventy-five prospective jurors were examined and all stated under oath that they could and would give defendant a fair and impartial trial, except three or four, who said they had formed fixed opinions, and one or two who were opposed-to capital punishment. The only evidence in the record is that attached to the bills in which challenges for cause were overruled as to eight of the jurors. In view of the fact that we find nothing in their testimony to show that a fair trial could not'have been had, and, cohsidering the further fact that a satisfactory jury was obtained without the use of all challenges, we find no, error in the ruling. This bill also has not been mentioned by counsel.
Bill No. 19.
[6, 7] Bill No. 19 states that after calling several witnesses preliminarily, the state “undertook to introduce in evidence a purported confession of the defendants by the witness Frank Carter,” which was objected to upon the ground that it was not a confession as to the defendant Gideon Rester. We again quote the per curiam of the judge:
“As shown by the notes of the stenographer, the jury was retired when this motion was filed; the objection being that the confession or statement was not a confession as to Gideon Rester but only applying to Ms codefendant, John Murphy. The court now refers to the rulings as shown by the stenographer’s notes in this bill as to the fact that Frank Carter, the witness, stated under oath that the defendants Rester and Murphy came to his house the night after the homicide and together in the presence of each other stated to him all the facts relating to the killing and as related by him on the stand, and the court will say that the same facts were related by both defendants when witnesses on the stand in their own behalf. The court will further state that at the time this testimony was admitted to the jury the court charged the jury that if it found any statement testified to by the witnesses as having been made by either of the .defendants out of the presence of the other, such statement could only be considered as testimony against the defendant making such statement.”
Neither the evidence taken out of the presence of the jury nor that offered before them is in the record. We must therefore accept the judge’s statement, and hence find no cause to reverse his ruling.
Bill No. 20.
Bill No. 20 covers an identical condition with respect to a statement or confession alleged to have been made by defendants to the witness Jap Little. The ruling was correct.
Bill No. 21.
[8, 9] The state placed the district attorney upon the stand for the purpose of proving a confession alleged to have been made in the lobby of the jail which was objected to until a proper foundation as to its voluntary nature had been laid. The jury was withdrawn from the courtroom, and the state called certain witnesses to make the showing and rested; then the defense put ih its evidence, and the state called other witnesses in rebuttal, which was objected to “for the reason that the state had made its case in chief as to the nature of the purported confession before the defendants introduced their testimony, and the state now has no right under the law to introduce any testimony as to the nature of the confession except rebuttal testimony.” The objection was overruled, with reservation of defendants’ exception.
All of this took place out of the presence *200 of the jury, and hence no possible injury could have resulted. In any event, we think the court has and had the right and discretion to hear all available evidence to guide it in ruling upon the objection, and was not restricted to the formal rules applicable to the trial before the jury.
Bill No. 22.
[10] This bill presents the objection to admitting in evidence of testimony of witnesses to prove an alleged confession made in the lobby of the jail. The contention was that the same was not free and voluntary.
The record shows that two deputy sheriffs (for whose murder defendants were tried) had been sent to arrest the operators of a still which had been discovered some days before; that these officers had mysteriously disappeared, and posses had been formed and a search made for them without success; that a belief had arisen that they had been murdered, and several persons, including defendants, had been suspected, arrested, and were in jail; and that one of these had informed officers of the state that the two defendants could tell where the missing deputies could be found.
Thereupon the two defendants, apparently with the consent of the sheriff’s force, were taken from the jail to a room in the courthouse, blindfolded, ropes put around their necks, and severe punishment inflicted for the purpose of compelling them to tell where the bodies (it being, by this time, generally accepted -that they had been killed) of the missing officers could be found. Intermittent punishment and grilling of the accused continued iron! about 9 or 10 o’clock Tuesday night until 2 o’clock Wednesday morning, when Rest-er finally confessed, at least in part, and agreed to point out the location of the bodies. Murphy was then brought into Rester’s presence, and, being informed what the latter had said, and Rester reminding him of his promise, the exact nature of which was not revealed at the time, also told a version of the matter; and the two were carried by a posse of from 50 to 100 men to the scene and pointed to the spot where the bodies .were found.
Witness for the state testified that the object of forcing the accused to tell where the bodies were was in order that their families and friends might give them a decent burial. At the scene, when the bodies were taken from the mud into which they had been trampled, responsible citizens addressed the assembled crowd and urged that the law be allowed to take its course. The accused were not harmed, and they were assured that they would be protected and given a fair trial. They were then returned to the jail.
Some time during the day on Thursday following, a minister visited Murphy in the jail and advised him to confess and prepare to save his soul, which he agreed to do. The district attorney having been informed that Murphy wanted to make a statement and had sent for him (by whom, the record does not. show, and which was denied by Mprphy as a witness), obtained a commercial stenographer from an adjacent town, and, at about 8 o’clock Thursday evening, accompanied by a reputable lawyer, who afterwards became associated with the prosecution, the mayor of the town of Franldinton, and two or three other persons, who had been present when the first confessions were forced, if they had not actually participated therein, went into the lobby of the jail and had Murphy brought down. He was asked if he wanted to make a statement. His reply was that he would, and he was requested to do so in order that the stenographer might take it down, which was done.
Thereafter Rester was brought down, and, being informed of Murphy’s course, was also asked if he would make a statement so that it could be taken down, and this he did.
Nothing was said or done in the way of threats, promises, or punishment; and, ac *201 cording to the state’s witnesses, consisting of most if not all of those who were present, except the prisoners, the accused were normal in their demeanor and appearance. On the other hand, while admitting that he had had an interview with a minister, as a result of which he had decided to tell it all in order to save his soul, Murphy denied that he had sent for the district attorney. There was no effort made to prove by whom the alleged message had been sent. Both accused swore that they had made the statements or confessions in the jail because, in the light of their experience in the courthouse, they thought after doing so, they would be hanged, and but for that fact would not have done so. There were present on this last occasion some of the persons, including the mayor of the town, who had at least been present if not actually participating in the punishment at the courthouse. Although, as above stated, their confessions were taken down by a stenographer, the lower court refused to compel the district attorney, when requested to do so by counsel for the accused, to produce the-stenographic report, either for examination or use by the defense, or for submission to the jury, for the reason, as stated, by the court, counsel for the state claimed it had been incorrectly transcribed and contained many errors.
Considering the circumstances above narrated, and in view of the exclusion of the stenographic report of the confessions, which was unquestionably important and material, not only upon the point as to what was actually said by the accused, but as to such evidences as it might have borne as to the manner and methods used in having it made, we think the court erred in admitting the confessions. We are not to be understood as meaning by this that, if' the report had been produced, it would have made the confessions any the less objectionable; it is simply mentioned as a circumstance tending to show the insufficiency of the state’s proof in attempting to establish that they were voluntarily made.
It is true that, in his testimony taken out of the presence of the jury, Murphy stated that he had promised the minister to “come clean”; that he had done so; that what he had said at the jail was true;' and in one place in his testimony the following appears:
“Q. When I went to the jail, didn’t you tell me all about this thing?
“A. Yes, sir.
“Q. Did you do it willingly?
“A. Yes, sir.”
[11,12] However, in other instances, he said he was afraid not to tell about it. At no place does it appear that he admitted the version of the confession detailed by the state’s witnesses, or that he appeared before the jury and told the same story, except in an amended per curiam which it was sought to have us consider, filed several months after the appeal had been lodged here. In the per curiam to bill No. 19, dealing with the testimony of the witness Drank Garter, the court says that “the same facts (those detailed by Carter as having been told by the accused the night after the killing, and about a week before the confession at the jail) were related by both defendants when witnesses on the stand in their own behalf.” However, there is nothing to show that they were the same facts as testified to by the witnesses with respect to what took place at the jail. As just intimated, several weeks after the transcript had been lodged here, and after the case had been once continued, counsel for the state obtained from the trial court amendments to the per curianas to certain of the bills, and asked to have them considered by us. In these amendments, he says the two accused took the stand in their own behalf and corroborated every phase of the state’s testimony as to what was said at the jail, except that Hester denied that an agreement had been reached before the still was raided as to what *204 would be done by the accused if apprehended ; and that, while Murphy did not mention in his direct testimony any such agreement, on cross-examinatiori said he did not remember it, but would not deny it. A rule to show cause was issued by this court and served upon counsel for defendants as to why the amendments should not be allowed, and, although in answer, no objection was urged, it was said that they might be considered, provided all of the evidence was brought up and also considered by this court. This, of course, we could not do.
We do not feel that we can sanction a proceeding like the one attempted in this case. The trial court should, at the time the bills are presented, or as soon thereafter as possible, at least before the transcript is completed and filed in this court, write its per curiams to all bills. While we are sure no judge would willingly make an incorrect statement, yet we are all human, and it is not impossible that memory might fail us.
[1 3] The law presumes, once a showing has been made that an accused confessed through fear or the promise of relief, that such condition of mind continues at any subsequent confession, unless it be proven that by the lapse of time, and by the circumstances under which it was made, the act of the prisoner was entirely free and voluntary. State v. Wood, 122 La. 1014, 48 South. 438, 20 L. R. A. (N. S.) 392.
[14] After a careful consideration of the record, we cannot but feel that the state has failed to make the proper showing in the present ease. There might have been sufficient evidence to have convicted the defendants without it, including their own statements on the stand; but that was a matter for the jury to determine, under the Constitution, and we are bound to assume that the evidence thus illegally put before them prejudiced the rights of the accused.
Bills Nos. 23 and 24.
[15,16] It developed, in the course of the testimony of the district attorney, as heretofore stated, that the confessions of the accused were taken down by a stenographer; and before any evidence was submitted to the jury to prove said confessions, counsel for defendant made objection thereto upon the ground that the stenographer’s report was the best evidence, which was overruled and bill No. 23 reserved. However, it was shown not to have been signed or read thereafter by the accused, and, if erroneous, as contended by the state, the state was not bound to offer the same in evidence, and to thereby bind itself as to the nature of the confessions. On the other hand, counsel for the defense asked that the state be compelled to produce it for examination and use by them if it contained anything in defendants’ favor; but this request was also denied, and forms the basis of bill No. 24.
Regardless of its correctness or incorrectness, we think accused were entitled to have it. It would have been for the defense to determine as to whether they would use it, and for the jury to decide as to its qffect, together with all the other evidence. Especially should it have been produced, since no one else was present at the time or produced as witnesses save those for the state. Counsel for the state should not have been permitted to say whether it was correct or not, but it should have been produced, and that question determined by the court and the jury, if it had gone to them. It was certainly very relevant upon the nature and circumstances of the confessions. State v. Guagliardo, 146 La. 949, 84 South. 216.
Bill No. 25.
[17] Counsel for accused (one of whom was from Mississippi and accustomed to the practice in that state) moved to exclude the evidence of the state, and that the court in *205 struct a verdict for the defendant, Hester, which was refused and forms the basis of bill No. 25.
Such practice is unknown to our law, and the ruling refusing the instruction was correct.
Bill No. 26.
[18] Bill No. 26 was retained to the general written charge, in that it was claimed to be erroneous as to the weight of the evidence. No special error was or is pointed out, the bill has not been mentioned, and the issue was not presented in a manner to be acted upon by either the lower judge or this court.
Bill No. 27:
[19] Defendants’ counsel asked that the written charge be actually delivered to the jury instead of being read to them by the court, as was done. We know of no law to sustain such a reguest.
Bill No. 28.
This bill covers the refusal to give the following special charges:
No. 1. “The court instructs the jury that each and every juror should vote his own convictions, and not the convictions of some other juror or jurors, and if there is one man on the panel who has a reasonable doubt of the guilt of the defendants, arising either from the evidence or a lack of evidence, he should by all means never vote for conviction while he-has such doubt.”
No. 7. “The court instructs the jury that one who only assists in hiding the bodies, or concealing the crime, or in aiding the principal in any other way, after the crime of homicide is completed, is only an accessory to the main crime, and cannot be convicted of either murder or manslaughter, under an indictment for murder.”
No. 8. “The court instructs the jury that before you can convict the defendant Gideon Hester, you must believe, solely from the evidence and beyond all reasonable doubt, that he had some part or connection with the killing before it had been completed, and this is true, even though his guilt is more probable, from the evidence, than his innocence. One who has had nothing to do with the homicide except to hide the body and conceal the crime is, under the law, not guilty of the main crime, but is only guilty of what is termed in law ‘an accessory after the fact’ which is a different crime and must be tried under a separate indictment.”
No. 9. “The court instructs the jury that it is your sworn duty, if possible, to harmonize and reconcile all proven facts with the theory of innocence, and if you are able to do this then guilt is not established to that degree of certainty required by law, and you should promptly acquit, rather than convict. The statement of Gideon Rester that he only helped bury the bodies after they were dead, and then concealed the homicide, is not a confession of guilt under the indictment, but is in fact and truth a denial of guilt, and he being corroborated therein, if in fact he is corroborated, you must acquit him unless there is other evidence which convinces you beyond all reasonable doubt that he had some other part in the killing.”
, No. 10. “The court instructs the jury that evidence is always insufficient to convict upon where, taking all facts as proven which the evidence tends to prove, the defendant’s innocence may yet be reasonably possible; for it is the exclusion of every reasonable possibility of innocence which establishes guilt to that degree of certainty required by law. Therefore, even though you believe, beyond all reasonable doubt, strictly on the evidence, that the defendant Gideon Rester, was distilling whisky at the scene of the killing, and that he was present at the time of the killing, that he assisted in the burial of the bodies, and that he kept the crime secret until he was induced to disclose it under torture, or that he disclosed it for other reasons, yet you must find him not guilty unless you further believe, not from conjecture but strictly from evidence, and that beyond every reasonable doubt, that he (Gideon Hester) had some connection with the homicide, prior to or during its commission.”
No. 11. “The court instructs the jury that there is no presumption of guilt upon proof of the killing of a human being where all of the attendant circumstances are testified to by eyewitnesses to the killing, but that the question as to who committed the crime is one to be determined by you from a consideration of the evidence introduced; therefore, before you can convict Gideon Rester of any charge under the indictment, the evidence introduced must make *208 it plain, certain, and clear, beyond every reasonable doubt, that Gideon Rester did something more in connection with the killing than to hide the bodies and conceal the crime, after the killing had been done.”
Ño. 12. “The court instructs the jury that if from the evidence it is -uncertain as to whether the defendant, Gideon Rester, merely assisted in the burial of the bodies and concealing the crime, or whether he took some other part therein, then the evidence does not amount to proof of any charge included in the indictment, and you must acquit the defendant Gideon Rester.”
No. 13. “The court instructs the jury that if, after the ease is closed, you reasonably and sincerely feel that you would .rather have stronger, more, or better evidence, as to the part Gideon Rester had in the killing before you vole for conviction as to him, then, and in that event, the guilt of the said Gideon Rester is not established to that degree of certainty required by law, and you should find him not guilty.”
[20] .The first charge was correctly refused as calculated to impress any juror with the idea that he should not listen to the arguments and views of his fellow jurymen, or he influenced thereby; when the contrary should be the case, if he is able to reconcile his own conception of the case, conscientiously, with that of his fellows.
[21, 22] The charges Nos. 7 to 13, inclusive, were also correctly refused as intrenching too much upon the facts; and, in addition thereto, it would have been very prejudicial to the other defendant to have singled out Rester and confined a charge of the law, even leaving out the facts, to him alone. These charges are otherwise more or less involved, intricate, and calculated to confuse the ordinary lay mind. A charge to a jury should be as direct and simply constructed as it is reasonably possible to have it. Both our Constitution and statute prohibit the judge from commenting upon the facts.
Por the reasons assigned, the conviction and sentence are set aside, and this case is remanded, to be proceeded with according to law and the views herein expressed.